# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| CHRISTOPHER KERNS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 06-5575 |
| | : | |
| DREXEL UNIVERSITY, | : | |
| Defendant. | : | |
| | : | |

## Memorandum and Order

YOHN, J.                                                                July ____, 2008

Christopher Kerns brings this discrimination and retaliation suit against Drexel University under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e *et seq.*; the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621 *et seq.*; the Americans with Disabilities Act of 1990 ("ADA"), 42 U.S.C. § 12101 *et seq.*; the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*; and the Pennsylvania Human Relations Act ("PHRA"), 43 Pa. Cons. Stat. § 951 *et seq.* Drexel moves for summary judgment on all counts pursuant to Rule 56 of the Federal Rules of Civil Procedure. For the reasons discussed herein, the court will grant in part and deny in part Drexel's motion.

1

## I.     Factual and Procedural History [1]

Drexel employed Kerns, a forty-two-year-old, white male, from October 20, 1997 until August 3, 2006, when Drexel terminated his employment for the stated reason that he violated its leave without pay ("LWOP") policy when he was absent from work on July 24 and 25, 2006.

During the relevant periods of his employment, Kerns worked as a custodian and was a member of Teamsters Union Local 115 ("Local 115").  (Def. Statement of Undisputed Facts ¶ 15 ("Def. Facts"); Christopher Kerns Dep. 43:19-44:18, Sept. 25, 2007.)[2]  As a union member, Kerns's employment was governed by a collective bargaining agreement ("CBA") between Drexel and Local 115.  (Def. Ex. F, CBA.)  The CBA provides employees of Kerns's tenure with paid leave, including eleven sick days, two personal days, fifteen vacation days, and twelve holidays.  (Def. Ex. F, CBA Arts. XX, XXII & XXIV.)  Local 115 also provides health and welfare benefits to its members, providing them compensation and benefits for absences from work occasioned by injuries unrelated to work.  (Def. Facts ¶ 143; Pl. Ex. M.)

In addition to the CBA, Drexel and Local 115 established the LWOP policy for disciplining employees who exhaust all available leave and then fail to report to work.  (Def. Ex.

---

[1]  Except where otherwise noted, the account contained in this section is comprised of undisputed facts and Kerns's factual allegations.  For the present motion, the court views all facts and justifiable inferences in the light most favorable to Kerns, the nonmoving party.  *See Skoczylas v. Atl. Credit & Fin., Inc.*, No. 00-5412, 2002 WL 55298, at *2 (E.D. Pa. Jan. 15, 2002) ("When considering a motion for summary judgment, a court must view all facts and inferences in a light most favorable to the nonmoving party."); *see also Brown v. Muhlenberg Twp.*, 269 F.3d 205, 208 (3d Cir. 2001) (viewing facts on appeal of summary judgment "in the light most favorable to the [nonmoving parties, and] drawing every reasonable inference in their favor").

[2] All facts herein referenced by citation to Drexel's statement of facts have been admitted by Kerns as undisputed.  (*See generally* Def. Facts.)

Z, Letter from Frank J. Pizzulo to John P. Morris, Feb. 24, 1998; Michael Smith Dep. 20:1-9, Nov. 27, 2007; Darryl Carlton Dep. 119:12-120:24, Oct. 22, 2007; James Smith Dep. 20:14-24, 28:19-29:8, Nov. 30, 2007.)  Under the LWOP policy, Drexel permits one occurrence of LWOP in a ninety-day period without disciplinary action.  (*See* M. Smith Dep. 21:18-23-7; J. Smith Dep. 29:6-17.)  A second LWOP within a ninety-day period results in counseling.  (*See* M. Smith Dep. 72:14-73:13.)  A third LWOP within ninety days following counseling results in a verbal warning.  (*Id.*)  Within the nine months after a verbal warning, a fourth LWOP results in a written warning.  (*Id.*)  A fifth LWOP, if within the nine months following the written warning, results in a suspension.  (*Id.*)  Finally, a sixth LWOP in the next nine-month period may result in termination.[3]  Under the LWOP policy, Drexel normally counts sequential days of absence as a single LWOP occurrence.  (*Id.* at 72:14-73:13; Pl. Facts ¶ 26.)  Furthermore, Drexel does not treat  as an LWOP infraction an employee's absence that Local 115 covers under its health and welfare benefits program.  (M. Smith Dep. 84:21-85:10.)

On May 6, 2004, Kerns took medical leave because of a knee injury.  (Kerns Dep. 58:20-59:3.)  Kerns returned from medical leave on June 13, 2005.  (*Id.* at 227:7-12.)  Upon Kerns's return, Francis Pompili and Eric Ross were his custodial supervisors,[4] and Daryl Carlton was Pompili's and Ross's supervisor.[5]  (*Id.* at 69:3-71:10; Def. Ex. L, at KERNS0001.)  Ross and

---

[3] Kerns does not dispute the general outlines of Drexel's LWOP policy (*see* Pl. Resp. to Def. Facts ¶ 19 ("Pl. Facts")) but instead offers evidence demonstrating inconsistent application of the policy, as noted *infra*.

[4] Pompili supervised the buildings on the south side of Market Street, where Kerns primarily worked; however, both Pompili and Ross patrolled Kerns's building.  (Kerns Dep. 69:3-71:10; *see also* Carlton Dep. 42:13-19.)

[5] Pompili is white.  Ross and Carlton are African American.

3

Carlton would "literally follow [Kerns] around." (Kerns Dep. 215:9-18.) To Kerns, "it was unbearable at times." (*Id.*) They made "negative suggestive comments to [Kerns] constantly." (*Id.* at 215:19-24.) At one point, Carlton stated to Kerns that "the brothers are running the place down here now," which Kerns interpreted as referring to African Americans.[6] (*Id.* at 280:18-281:16.) Carlton told Kerns that he could find a new job and stated that he had some friends who needed work. (*Id.* at 281:17-282:5.) On another occasion, Ross refused to provide gloves to Kerns while Kerns was shoveling snow, despite a CBA provision requiring Drexel to provide necessary work gloves,[7] stating that "[y]ou white guys are used to the cold weather, it ain't going

---

[6] Kerns's complete account during his deposition was as follows:

Q:   Are there any other incidents that you believe showed that Mr. Ross, Mr. Carlton, and Mr. Pompili were discriminating against you on the basis of your race?

A:   Well, the one I think I told you about, with the one time when Daryl said, the brothers are running the place down here now. And he said something to the effect that he's got some of his boys that need work or need a job.

Q:   What did Mr. Carlton say?

A:   Pretty much that the brothers are running – Mayor Street made a comment, the brothers and sisters are running the City now. And Daryl said pretty much, just like Street said or something, the brothers are running it down here. That's what he said to me, and I just looked at him like . . .

Q:   When did Mr. Carlton say that to you?

A:   Approximately about July 12, 13, 14, right after he denied me that work on Sunday. He said, "Things are changing down here and I'm the new sheriff." And he went into this whole big spiel. And that's when he said, "The brothers are running down here now." You know what I mean? He goes, "You can find another job if you want."

Q:   And when he said "brothers," what did you take that to mean.

A:   African Americans.

(Kerns Dep. 280:18-282:9.)

[7] CBA Article XXX provides: "The Employer shall furnish work gloves . . . to each employee when needed and shall maintain the same without charge." (Def. Ex. F.)

to bother you out there."[8]  (*Id.* at 196:1-197:6.)  Ross, who had gloves, also refused to let a

coworker provide Kerns with gloves.  (*Id.* at 197:7-22.)

Starting in 2005, Pompili was the signatory on a series of disciplinary actions against

Kerns for violation of Drexel's LWOP policy.  Pompili disciplined Kerns with counseling on

June 17, 2005 for taking LWOP on the consecutive days of June 15 and 16, 2005.[9]  (Pl. Admis.

¶¶ 1-3, Attach. A.)  Pompili issued a second counseling-level disciplinary action against Kerns on

October 4, 2005 for taking LWOP on the consecutive days of September 26 and 27, 2005.  (Pl.

Admis. ¶¶ 9-13, Attach. C.)  After Kerns took LWOP on October 31, 2005, Pompili issued a

---

[8] Kerns's complete account was as follows:

Q:    Do you have any other facts that you believe support your claim for
      discrimination on the basis of race?
A:    Okay.  Well, another one was Eric – I was doing snow removal and I asked
      Eric Ross for a pair of gloves, because we usually work inside, but it was
      snowing.  And I believe – I'm not exactly sure what date it was, but Mr. Ross
      said, "We don't supply, we are not giving you gloves."  And he wouldn't give
      me gloves.  "You guys are used to that cold weather anyway."  So I perceived
      that as being, you know, you white guys – you know, and he pretty much –
      he did say it, but it was like I think he caught himself.
Q:    So what did he say exactly?
A:    Like "You white guys are used to the cold weather."
Q:    He said the words "white guys?"
A:    "You white guys are used to the cold weather, it ain't going to bother you out
      there."  And he wouldn't give me gloves.
Q:    Did he have gloves?
A:    That's part of our – he could have – yes, he did have gloves, he could have
      got them for me, but a coworker, Charles Carrier, ended up going out to his
      truck, because he was on the grounds, and he said, "Chrissy, I will get you
      gloves."  And he went out to his truck and got me gloves.  But he said, "Get
      outside," in the cold with no gloves, no boots.  I asked him for rubbers.  He
      wouldn't give me anything.  And if I refused it, that's discipline.
(Kerns Dep. 196:1-197:22.)

[9] Kerns testified that Carlton later rescinded the June 17, 2005 counseling-level
disciplinary action.  (Kerns Dep. 227:13-230:16.)

5

verbal warning on November 1, 2005.  (Pl. Admis. ¶¶ 14-18, Attach. D.)  Kerns received a

second verbal warning on November 22, 2005 for an LWOP infraction on November 21, 2005.[10]

(Pl. Admis. ¶¶ 19-23, Attach. E.)  Then, on  January 30, 2006, Pompili issued a written warning

against Kerns for his LWOP infraction on January 23, 2006.  (Pl. Admis. ¶¶ 24-28, Attach. F.)

The written warning was followed by a one-day suspension on February 8, 2006 for Kerns's

LWOP violation on February 7, 2006.  (Pl. Admis. ¶¶ 29-33, Attach. G.)  The February 8

suspension letter warned Kerns that "any other infraction of this type within the next 9 months

could result in your immediate termination."  (Pl. Admis. ¶ 32, Attach. G.)  Michael Smith,

director of Drexel's facilities management department, to whom Carlton reported, advised

plaintiff that "this is it Chris, you need to stop taking time off and understand that you are at the

end of the line, and that the next infraction you have leave without pay you are going to be

terminated."  (M. Smith Dep. 63:10-64:17; Def. Facts ¶ 52.)

      During this period, Pompili and Ross issued LWOP disciplinary actions against other

employees whose full names have been redacted from the record, including employees KC, CP,

EH, DF, BH, JF, MH, MR, AB, EG, and LB.  (Def. Ex. L, at KERNS0584-0618.)  LB and CP

received only counseling-level discipline for LWOP infractions after multiple nonconsecutive

absences.  (*See* Pl. Ex. F (documenting that African American employee LB incurred two

nonconsecutive LWOP absences before receiving counseling-level discipline); Pl. Ex. G

(documenting that Hispanic employee CP was issued counseling-level discipline only after

multiple nonconsecutive LWOP absences within the ninety-day period).)  In addition, a Hispanic

---

[10] Neither party explains and record does not reveal why Kerns received a second verbal
warning instead of a written warning, the next level of discipline.

employee, Effrain Garcia, received three suspensions for LWOP infractions of one, five, and twenty-eight days, respectively, before being terminated for a final LWOP infraction.  (Effrain Garcia Dep. 12:1-23, Oct. 26, 2007.)

On November 11, 2005, in the middle of the series of LWOP disciplinary actions taken against him, Kerns went to Drexel's human resources department to check his personnel file. (Def. Ex. C, at 49; Kerns Dep. 616:6-18.)  The next day Pompili followed Kerns around, questioning why he had gone to human resources.  (Kerns Dep. 616:6-18.)  When Kerns asked Pompili why he was "right over [his] shoulder all the time," Pompili informed him that "[o]ff the record, I was told to keep a close eye on you."  (*Id.*)  This order came from Carlton, Pompili's boss.  (*Id.*)  Pompili explained to Kerns that Carlton's instruction resulted in Pompili's write-ups and micromanagement of Kerns.[11]  (*Id.* at 616:21-617:12.)

Then, on December 8, 2005, Kerns formally complained to Rhonda Karp, senior associate vice president of quality and benefits in Drexel's human resources department, that Carlton, Pompili, and Ross were harassing him and discriminating against him.  (*Id.* at 290:14-24.)  He completed a "Complaint of Discrimination and/or Harassment" form, specifying discrimination based on race, disability, age, and union activities.  (Def. Ex. C, at 153.)  Kerns later testified that he was unsure of the exact motivation for Carlton's, Pompili's, and Ross's harassment, but thought "it was definitely race."  (Kerns Dep. 291:1-10, 474:6-476:7.)  In the December 8 meeting, Kerns identified the immediate impetus for his complaint as Pompili's decision to discipline him for failing to notify Pompili that he was going to miss work to attend a

---

[11] Pompili claims that he did not discipline Kerns because of pressure from Ross, Carlton, or Michael Smith.  (Francis Pompili Aff. ¶¶ 25-28, 31-33, 36-38, 41-43, 60-62, 65-67 & 85, Dec. 19, 2007.)

funeral.  (*Id.* at 292:20-293:21.)  During the incident, Kerns provided Pompili with a funeral card as proof of his attendance.[12]  (*Id.* at 263:1-14.)  When presented with the card, Pompili cursed and threw the card in the air.  (*Id.*)  Kerns felt that Pompili's actions and subsequent discipline of Kerns were "more harassment, intimidation and retaliation" and that this event was the "straw that broke the camel's back."  (*Id.* at 293:22-294:11.)

Four days later, on December 12, 2005, Pompili disciplined Kerns for poor work performance, although the parties dispute whether Pompili had knowledge of Kerns's complaint to Karp at that time.  (Ex. L, at KERNS02008.)  During Karp's investigation of Kerns's complaint, which may have commenced prior to December 12, 2005, Karp spoke to his supervisors, including Pompili.  (Karp Dep. 20:8-21.)  Pompili asserted, however, that he was unaware of Kerns's complaint on December 12.  (Pompili Aff. ¶ 53.)

Kerns filed his first discrimination complaint with the Philadelphia Commission on Human Relations ("PCHR") on December 27, 2005, alleging that Drexel discriminated against him on the basis of race, gender, age, and disability and retaliated against him.  (Def. Ex. A, at PCHR0007.)  He and Carlton then attended a PCHR fact-finding conference.  (Carlton Dep. 93:23-95:5.)  Kerns also attempted to address his complaints to Michael Smith, but Ross and Carlton prevented him from doing so by denying him the opportunity to approach Smith's office and threatening him with termination for failing to follow a directive.  (Kerns Dep. 283:4-286:15.)  Smith likewise refused to meet with Kerns to discuss his complaint and directed Kerns to Karp in human resources.  (*Id.* at 286:16-287:3.)  Following review by the PCHR, the case was

---

[12] According to Leo Reilly, Kerns's union steward, this card was sufficient documentation of his attendance at the funeral.  (Leo Reilly Dep. 46:23-47:9, Nov. 30, 2007.)

dismissed with a finding of "Charges Not Substantiated" on June 21, 2006.  (Def. Ex. A, at

PCHR0005.)  The complaint had been automatically filed with the EEOC, and the EEOC

adopted the PCHR's conclusion, dismissed the charge, and issued a notice of right to sue on

September 27. 2006.  (Def. Ex. B, EEOC Charge No. 17G-2006-00080; Def. Ex. C.)

Kerns was disciplined for reasons unrelated to his LWOP infractions on February 2,

March 6, March 8, May 12 and July 19, 2006.  (Def. Facts ¶¶ 39, 49.)  Kerns filed his second

EEOC complaint on June 5, 2006.  In this second charge of discrimination, he alleged that

Drexel retaliated against him for filing his original complaint and for initiating the internal

complaint with Drexel's human resources department on December 8, 2005.  (Def. Ex. D, EEOC

Charge No. 530-2006-01969.)

In the summer of 2006, Kerns met with Nadia McCrimmon, Drexel's benefits manager,

to request intermittent leave for generalized anxiety disorder and depression.  (Nadia

McCrimmon Dep. 19:14-20, Oct. 26, 2007.)  On June 8, 2006, Dr. John F. Lozowski diagnosed

Kerns with and treated him for generalized anxiety disorder and depression.[13]  (John Lozowski

Dep. 6:21-7:3, Nov. 27, 2007.)  In the past, Drexel has granted FMLA leave for these conditions.

(McCrimmon Dep. 31:12-17.)  To support his request, Kerns submitted an FMLA form WH-

380,[14] completed by Lozowski on July 6, 2006.  In section 5B of the form, which is the subject of

---

[13] During treatment, Kerns told Lozowski that his bosses were seeking retribution for his
union activities and that after he filed his EEOC claim, they treated him less favorably.
(Lozoswki Dep. 9:4-10:18.)

[14] The certification form requires the treating physician to describe, among other details,
the medical facts underlying the need for FMLA, the date and duration of the condition, whether
the patient will need to work intermittently or less than normal, the duration of absence from
work, treatment regimens and frequencies, and the type of workplace interference expected.
(Def. Ex. L, at KERNS0104-0110.)

the present FMLA dispute, Lozowski certified, "At times [patient] may be out of work or need to leave early related to stress." (Pl. Ex. S, at KERNS0303.) Lozowski noted that the duration would be "[u]p to 1-2 weeks intermittently." (*Id.*) McCrimmon, however, denied Kerns's FMLA request. (McCrimmon Dep. 25:22-26:6; Kerns Dep. at 412:6-19.)

A factual dispute exists as to the reasons McCrimmon provided to Kerns in justifying the denial. McCrimmon testified that she informed Kerns that Lozowski needed to clarify his request regarding stress-related leave, particularly when, why, and for how long Kerns would need leave due to stress. She also notified Kerns that one to two weeks was full leave rather than intermittent leave. (McCrimmon Dep. 20:20-24:5.) To the contrary, Kerns testified that McCrimmon only asked him to return the form to Lozowski to change one to two weeks into one to two days to better reflect an intermittent leave request. (Kerns Dep. 412:6-24.) Regardless of which version of these prior events is true, Lozowski undisputedly changed the form to reflect a duration of "one to two days," and this was the only change he made. (*Id.* at 412:6-24; Pl. Ex. X; Def. Ex. L, at KERNS0104-06.) Lozowski then faxed the changed form to Drexel Human Resources. (Kerns Dep. 412:6-24.) Kerns also hand delivered a copy. (*Id.* at 413:2-5.)

Another factual dispute emerges regarding the ensuing events. McCrimmon testified that she and Ellen Posner, Drexel's director of benefits and compensation, reviewed the form and Posner advised her that Kerns's request would possibly qualify him for benefits under the ADA. They sent Kerns's file to Michelle Peters, Drexel's director of the office of disability services, who was in charge of administering ADA claims. (McCrimmon Dep. 31:18-32:3.) According to McCrimmon, she then verbally notified Kerns that the second certification did not qualify him for FMLA benefits, told him that Lozowski still needed to add detail regarding the need for

stress-related leave, and said that Kerns should see Peters regarding an ADA claim.  (*Id.* at 33:3-17; 35:4-11; 52:1-24.)  McCrimmon testified that she did not recall receiving any additional messages or follow-up from Kerns.  (*Id.* at 35:23-37:10.)

According to Kerns, whose testimony must be accepted for the present motion, when he submitted the second FMLA request form, McCrimmon told him, "Everything looks like it is in order.  And, you know, you should have no problem."  (Kerns Dep. 420:11-14.)  Kerns asked if there was anything else he could do, and McCrimmon replied, "No, you're fine."  (*Id.* at 422:22-423:23.)  Kerns followed up with telephone calls to McCrimmon and Posner, calling McCrimmon on a daily basis and leaving voicemail messages.  (*Id.* at 324:3-325:22.)  Kerns denies that McCrimmon ever told him that his request for FMLA leave would be denied.  (*Id.* at 428:4-20.)

Kerns's request for FMLA leave was never officially approved or denied by Drexel.  (McCrimmon Dep. 54:17-22.)  On or before July 11, 2006, Kerns provided Michael Smith with a request for FMLA leave (Pl. Ex. W), and on July 14, 2006, Peters also notified Smith about the request (Peters Dep. 38:15-24).[15]

On July 24, 2006 Kerns left work early because of a panic attack, vomiting, and shaking.  (Kerns Dep. 433:24-434:13; Pl. Admis. ¶ 34.)  Kerns did not consult Lozowski about his symptoms, although they were consistent with Lozowski's earlier diagnosis of anxiety disorder.  (Lozowski Dep. 40:1-17, 41:9-18, 63:4-64:7.)  Kerns did not report for work on July 25, 2006, either.  On his way to work that morning, he was mugged.  (Pl. Admis. ¶ 35.)

---

[15] Smith, however, denied that he was ever notified.  (M. Smith Dep. 43:4-45:5.)

On July 26, 2006, Michael Smith issued a disciplinary memorandum against Kerns titled "Suspension Pending Termination for Leave Without Pay." (Def. Ex. L, at KERNS0655.) After listing Kerns's previous LWOP violations, the memorandum stated, "Finally and most recently, on July 24, 2006, you left work at 7:41AM and again called out on July 25, 2006, with no time available, which again violated the Leave Without Pay policy." (*Id.*) Smith testified that "technically [Kerns] was terminated because of his infraction on the 24th." (M. Smith Dep. 39:16-40:2.) Smith conceded that if Kerns received Local 115 health and welfare benefits for July 25, 2006, that day would not have been counted against him for LWOP "because he would have been paid for by the union." (*Id.* at 84:21-85:10.) Smith, however, continued that Kerns's absence on the July 25 "would have been irrelevant because when we decided the termination, he was terminated the 24th so if he filed for health and welfare on the 25th it wouldn't have counted because he would have been unemployed." (*Id.* at 40:13-19.)

The disciplinary memorandum noted that the suspension would remain in place until Local 115 completed its investigation and Drexel made a decision regarding termination. (Def. Ex. L, at KERNS0655.) Effective August 3, 2006, Drexel terminated Kerns's employment because of his LWOP violations. (*Id.* at KERNS0656.) The final termination letter dated August 11, 2006 justified Drexel's decision to terminate Kerns's employment based on his violation of its LWOP policy, although the letter did not specify the operative LWOP infraction dates. (*Id.*) Posner asked McCrimmon to ensure that Kerns was not terminated because of his pending FMLA request. (Posner Dep. 33:15-34:1.) McCrimmon reported to Posner that Kerns was fired

due to absence unrelated to his FMLA request.  (*Id.* at 34:3-11.)[16]   Karp told Peters that Kerns

was fired for performance, not attendance reasons.  (Peters Dep. 44:14-45:4.)

On behalf of Local 115, James Smith grieved Drexel's decision to terminate Kerns's

employment.  (J. Smith Dep. 13:20-14:3.)  James Smith requested that Kerns's absence on July

25, 2006 be excused based on extenuating circumstances because Kerns was mugged that

morning.  (*Id.* at 19:13-19.)  To support this request, James Smith asked Kerns to produce a

police report to corroborate the mugging.  (*Id.* at 23:5-8, 24:21-25-2.)  Kerns never produced a

police report or other proof of the mugging.  (*Id.* at 25:3-5, 26:24-27:4.)  At the grievance hearing

on August 1, 2006, James Smith and Kerns did not mention Kerns's application for Local 115

health and welfare benefits as a result of the mugging or Kerns's FMLA leave request.  (*Id.* at

14:23-15:9, 21:5-9; M. Smith Dep. 75:1-7.)  Despite Local 115's grievance, Drexel refused to

amend or modify the termination.

On August 9, 2006, Lozowski treated Kerns for physical injuries resulting from the

mugging on July 25, 2006.  (Lozowski Dep. 32:4-14.)  Kerns requested that Lozowski complete

paperwork for his employer regarding the assault.  (*Id.* at 32:20-33:15.)  Lozowski signed

Kerns's request for Local 115 health and welfare fund benefits on August 9, 2006.[17]  (Def. Ex. C,

at 291.)  Kerns subsequently received health and welfare benefits from Local 115 for July 25,

2006.

---

[16] After Drexel terminated Kerns, McCrimmon received a copy of the termination letter
for her signature, although during her deposition she did not recall the reason for his termination.
(McCrimmon Dep. 37:13-38:8.)

[17] Michael Smith's deposition testimony evidences that Kerns provided a health and
welfare benefits application to him on August 2, 2006.  (M. Smith Dep. 77:23-79:9.)

Kerns filed his final complaint with the EEOC on September 14, 2006.  He alleged that

Drexel retaliated against him when it terminated his employment on August 3, 2006.  (Def. Ex.

E, EEOC Charge No. 530-2008-00280.)  Both his second charge, filed on June 5, 2006, and this

third charge were forwarded to the Pennsylvania Human Relations Commission ("PHRC").  (Pl.

Exs. B & D, Coverletters.)  The EEOC issued notices of right to sue for both the second and third

charges on November 6, 2007 because Kerns "filed suit in Federal District Court with respect to

the issues in this charge."  (Pl. Exs. C & E.)

Kerns filed suit in this court on December 22, 2006 and filed the Amended Complaint on

May 24, 2007.  The Amended Complaint lists six counts arising from Drexel's discipline and

termination of Kerns:  (1) racial discrimination and retaliation for engaging in a protected activity

in violation of Title VII; (2) age discrimination and retaliation for engaging in a protected activity

in violation of the ADEA; (3) discrimination on the basis of disability and retaliation for

engaging in a protected activity in violation of the ADA; (4) violation of the PHRA; (5) violation

of the FMLA; and (6) retaliation in violation of the FMLA.  Drexel has moved for summary

judgment on all of these claims.[18]

---

[18] In Counts II and III of the Amended Complaint, Kerns alleges ADEA and ADA
violations, respectively.  Drexel moves for summary judgment on these claims.  In his
memorandum of law in opposition to Drexel's motion for summary judgment, Kerns concedes
that "there is insufficient evidence to permit his claims of age discrimination or disability
discrimination to proceed to trial."  (Pl. Mem. Opp'n Def. Mot. Summ. J. 8.)  With Kerns's
consent, the court will, therefore, grant Drexel's motion for summary judgment and enter
judgment for Drexel as to Counts II (ADEA) and III (ADA) of the Amended Complaint.

II.     **Discussion**

    A.     **Standard of Review**

A motion for summary judgment will be granted only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party thus bears the initial burden of showing that there is no genuine issue of material fact and that it is entitled to relief. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once the moving party has met its initial burden, the nonmoving party avoids summary judgment by presenting "specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585 n.10 (1986) (quoting Fed. R. Civ. P. 56(e)). Where the nonmoving party bears the burden of persuasion at trial, it meets its burden at the summary judgment stage by supporting each essential element of its claim with concrete evidence "from which a rational person could conclude that [its] position . . . on the disputed issue is correct." *Ideal Dairy Farms, Inc. v. John Lebatt, Ltd.* 90 F.3d 737, 743 (3d Cir. 1996) (quotation marks and citations omitted); *see also Celotex*, 477 U.S. at 322-23; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986) ("The mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff."). Thus, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita*, 475 U.S. at 587.

When a court evaluates a motion for summary judgment, "[t]he evidence of the non-movant is to be believed." *Anderson*, 477 U.S. at 255. Furthermore, "all justifiable inferences

are to be drawn in [the nonmovant's] favor." *Id.*  "Summary judgment may not be granted . . . if there is a disagreement over what inferences can be reasonably drawn from the facts even if the facts are undisputed." *Ideal Dairy Farms*, 90 F.3d at 744 (quotation marks and citations omitted).  However, "an inference based upon a speculation or conjecture does not create a material factual dispute sufficient to defeat entry of summary judgment." *Robertson v. Allied Signal, Inc.*, 914 F.2d 360, 382 n.12 (3d Cir. 1990).

### B.      Administrative Exhaustion

Drexel moves for summary judgment on Counts I and IV of the Amended Complaint, asserting that Kerns did not exhaust available administrative remedies for his racial discrimination claims.  Drexel contends that it is entitled to summary judgment because Kerns failed to file an administrative charge alleging racially discriminatory termination and failed to acquire a right-to-sue notice for the retaliatory termination charge he did file.

Before filing a federal complaint claiming violations of Title VII and the PHRA,[19] a plaintiff must timely file the relevant discrimination or retaliation charge with the EEOC and with the PHRC and exhaust his available administrative remedies with those agencies.[20]  *See EEOC v. Commercial Office Prods. Co.*, 486 U.S. 107, 110 (1988); *Clay v. Advanced Computer Applications, Inc.*, 559 A.2d 917, 919 (Pa. 1989).  "If, after 180 days, the EEOC has not resolved the charge, it must notify the complainant, . . . generally through the issuance of a 'right-to-sue'

---

[19] The FMLA does not appear to require exhaustion of administrative remedies.  *See* 29 U.S.C. § 2617.  In any case, Drexel does not argue that Kerns was required to exhaustion his FMLA claims.

[20] Filing a discrimination charge with the PCHR is considered tantamount to filing a complaint with the PHRC.  *See Kedra v. Nazareth Hosp.*, 857 F. Supp. 430 (E.D. Pa. 1994); *Marriott Corp. v. Alexander*, 799 A.2d 205, 208 (Pa. Commw. Ct. 2002).

16

letter, in which the EEOC states that it sees no reason to take action on the complaint." *Burgh v. Borough Council of Montrose*, 251 F.3d 465, 470 (3d Cir. 2001). "The receipt of the right-to-sue letter indicates that a complainant has exhausted administrative remedies, an essential element for bringing a claim in court under Title VII. . . . A complainant may not bring a Title VII suit without having first received a right-to-sue letter." *Id.*

The ensuing federal lawsuit is limited to the claims that are within the scope of the original administrative charge. *Antol v. Perry*, 82 F.3d 1291, 1296 (3d Cir. 1996). In the Third Circuit, claims are considered within the scope of the EEOC charge not only if the complainant describes the specific factual claims within the original charge, but also if the claims arise during the pendency of the EEOC investigation, are closely related to conduct alleged in the charge, or are explanations of the original charge. *See Waiters v. Parsons*, 729 F.2d 233, 234 (3d Cir. 1984); *Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir. 1984); *Ostapowicz v. Johnson Bronze Co.*, 541 F.2d 394, 398-99 (3d Cir. 1976). Thus, "[a] victim of discrimination is not required to exhaust administrative remedies with respect to a claim concerning an incident which falls within the scope of a prior EEOC complaint or the investigation which arose out of it, provided that the victim can still bring suit on the earlier complaint." *Waiters*, 729 F.2d at 235.[21]

The Third Circuit in *Waiters* considered the claims of an employee who filed a retaliation charge against her employer with the EEOC, was subsequently laid off, and did not pursue an additional retaliatory termination charge with the EEOC. *Id.* at 236. The Third Circuit allowed

---

[21] In *Waiters*, the Third Circuit noted that "[t]he rationale behind these decisions is that once the EEOC has tried to achieve a consensual resolution of the complaint, and the discrimination continues, there is minimal likelihood that further conciliation will succeed. This slim likelihood of successful conciliation does not justify forcing the victim to wait an additional 180 days to file suit." 729 F.2d at 237.

the employee to proceed with her lawsuit despite her failure to file another EEOC charge because "[w]hile it is true that the allegedly discriminatory officials and acts are different, the core grievance—retaliation—is the same and, at all events, it is clear that the allegations of the appellant's complaint fall within the scope of the [EEOC's] investigation of the charges contained in the [original] formal complaint." *Id.*

In this case, Kerns filed administrative charges on December 27, 2005; June 5, 2006; and September 14, 2006.  (Def. Facts ¶¶ 1, 5 & 10.)  The December 27, 2005 charge complained of, inter alia, racial discrimination and retaliation.  The June 5, 2006 and September 14, 2006 charges complained of retaliation for Kerns's December 27, 2005 charge and for internal complaints to Drexel's human resources department.  (Pl. Exs. B & D.)  The EEOC issued a right-to-sue letter for the December 27, 2005 charge on September 27, 2006.  (Def. Ex. B.)  The EEOC issued notices of right to sue for the June 5, 2006 and September 14, 2006 charges on November 6, 2007 because Kerns "filed suit in Federal District Court with respect to the issues in this charge."  (Pl. Exs. C & E.)   Kerns has not argued that these later notices of right to sue are sufficient to prove exhaustion of administrative remedies for his racial discrimination claims.[22]

Nonetheless, the facts of this case mirror the facts of *Waiters*, allowing the court to conclude that his claims of racial discrimination and retaliatory termination are within the scope of the right-to-sue letter that the EEOC issued for the December 27, 2005 charge.  As in *Waiters*, the core grievances of this lawsuit, racial discrimination and retaliation resulting in termination, substantially overlap with the grievances in the December 27 PCHR charge, including racial

---

[22]  Kerns has also forgone argument that the EEOC should have issued a notice of right to sue for his June 5, 2006 complaint prior his filing of this suit on December 22, 2006 because the 180-window for administrative action had expired.

discrimination and retaliation for pursuing protected remedies. And, the additional acts alleged in the Amended Complaint occurred while the EEOC investigation of the first charge was pending. This case, in fact, presents a stronger basis for allowing the claims of retaliation to proceed on the merits than did *Waiters*. Unlike *Waiters*, the alleged actors here—Carlton, Ross and Pompili—were the actors in both the December 27, 2005 PCHR charge and the subsequent claims raised in this lawsuit. The only difference between the first EEOC charge and the Amended Complaint was the specific act of discrimination and retaliation alleged in the latter, Kerns's termination. Thus, Kerns sufficiently exhausted his administrative remedies for his discriminatory and retaliatory termination claims because those claims are within the scope of the charges of discrimination and retaliation that Kerns alleged in the December 27, 2005 PCHR charge. Kerns has, therefore, preserved his right to sue in this court. The court will deny Drexel's motion for summary judgment as to Counts I and IV of the Amended Complaint on the basis of Kern's purported failure to exhaust administrative remedies for his racial discrimination and retaliation claims.

### C.      Substantive Claims

#### 1.      FMLA Interference Claim

In Count V of the Amended Complaint, Kerns alleges that Drexel violated the FMLA by interfering with his right to take FMLA leave to which he was entitled. In particular, instead of allowing him to return to work after taking FMLA leave on July 24, 2006, Drexel terminated his employment for his FMLA-related absence. (*See* Pl. Mem. Opp'n Def. Mot. Summ. J. 11-12.) Drexel moves for summary judgment on Kerns's FMLA claim on the grounds that Drexel provided Kerns with his FMLA entitlements and Kerns suffered no injury because, assuming that

his absence on July 24, 2006 was for FMLA-related reasons, he was also terminated for his

absence on July 25, 2006, which was unrelated to his FMLA-qualifying medical condition.  (Def.

Mem. Supp. Mot. Summ. J. 23-24.)

Pursuant to the FMLA, "[i]t shall be unlawful for any employer to interfere with, restrain,

or deny the exercise of or the attempt to exercise, any right provided under the [FMLA]."  29

U.S.C. § 2615(a).  "The issue in an interference claim is simply whether the employer provided

its employee the entitlements set forth in the FMLA."  *Reinhart v. Mineral Techs., Inc.*, No. 06-

1483, 2006 U.S. Dist. LEXIS 89278, at *39 (E.D. Pa. Nov. 7, 2006) (internal quotation marks

and citation omitted).

The FMLA entitles an eligible employee to "a total of 12 workweeks of leave during any

12-month period . . . [b]ecause of a serious health condition that makes the employee unable to

perform the functions of the position of such employee."  29 U.S.C. § 2612(a)(1)(D).  This leave

may be taken intermittently when medically necessary.  *Id.* § 2612(b)(1).  The FMLA allows the

employer to require a health care provider to certify support for the FMLA-requested leave.  *Id.* §

2613(a).  The certification is legally sufficient if it states:

> (1) the date on which the serious health condition commenced;
> (2) the probable duration of the condition;
> (3) the appropriate medical facts within the knowledge of the health care
> provider regarding the condition; . . . [including] a statement that the employee is
> unable to perform the functions of the position of the employee;
> . . .
> [and]
> (6) in the case of certification for intermittent leave . . . , a statement of the
> medical necessity for the intermittent leave . . . , and the expected duration of the
> intermittent leave . . . .

*Id.* § 2613(b).

20

Under the Department of Labor's corresponding regulations, "[i]f an employee submits a complete certification signed by the health care provider, the employer may not request additional information from the employee's health care provider."  29 C.F.R. § 825.307(a); *see also id.* § 825.306(b) ("Form WH-380, as revised, or another form containing the same basic information, may be used by the employer; however, no additional information may be required.").[23]

If an employee submits an incomplete certification, "[t]he employer shall advise [the] employee . . . and provide the employee a reasonable opportunity to cure any such deficiency." *Id.* § 825.305(d).  If the certification is complete, but the employer doubts its validity, "the employer may require, at the expense of the employer, that the eligible employee obtain the opinion of a second health care provider designated or approved by the employer concerning any information certified under subsection (b) for such leave."  29 U.S.C. § 2613(c).  "Pending receipt of the second . . . medical opinion, the employee is provisionally entitled to the benefits of the [FMLA]."  *Id.* § 2613(a)(2).

When seeking relief under the FMLA, the plaintiff bears the burden of proving his prima facie case of entitlement and the defendant's interference.  The plaintiff must show that "(1) he was an eligible employee under the FMLA, (2) defendant is an employer subject to the

---

[23]   The court may properly rely on the Labor Department's regulations promulgated pursuant to the FMLA.  Congress directed to the Secretary of Labor to issue regulations "necessary to carry out" the FMLA.  29 U.S.C. § 2654.  *See generally Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 86 (2002).  The court must give considerable weight to the Secretary's judgment that a particular regulation fits within the statutory framework, *see United States v. O'Hagan*, 521 U.S. 642, 673 (1997), and neither party in this case has challenged the regulations as "arbitrary, capricious, or manifestly contrary to the statute," *id.* (quoting *Chevron U.S.A. Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984)).

21

requirements of the FMLA, (3) he was entitled to leave under the FMLA, (4) he gave notice to

the defendant of his intention to take FMLA leave, and (5) the defendant denied him benefits to

which he was entitled under the FMLA." *Weisman v. Buckingham Twp.*, No. 04-4719, 2005 U.S.

Dist. LEXIS 11696, at *11 (E.D. Pa. June 14, 2005) (citations omitted).  The parties do not

dispute elements one and two and, if Kerns was entitled to take FMLA leave, elements four and

five.

The parties principally dispute whether Lozowski's certifications using form WH-380

qualified Kerns for FMLA leave under element three of the prima facie case.  Lozowski

diagnosed Kerns with generalized anxiety disorder and depression (Pl. Ex. S, at KERNS0303),

for which Drexel has previously granted FMLA leave (McCrimmon Dep. 31:12-17).  Lozowski

completed two versions of form WH-380 for Kerns.[24]  On section 5B of the first iteration of the

form, Lozowski wrote, "At times [patient] may be out of work or need to leave early related to

stress." (Pl. Ex. S, at KERNS0303.)  Lozowski noted that the duration would be "[u]p to 1-2

weeks intermittently." (*Id.*)  McCrimmon testified that Lozowski's answer to section 5B

concerned her. (McCrimmon Dep. 22:19- 23:15.)  After reviewing the form with Posner,

McCrimmon notified Kerns that one to two weeks was not intermittent leave and that Lozowski

would have to correct the mistake on the form.[25]  (Kerns Dep. 411:17-412:24.)  Lozowski

---

[24] It is undisputed that Drexel allows employees to use form WH-380 to satisfy the
certification requirement.

[25] McCrimmon's and Kerns's testimonies conflict in material ways.  McCrimmon
testified that she informed Kerns that Lozowski needed to clarify his request both because stress
was not a ground for FMLA leave and because one to two weeks was full leave rather than
intermittent leave. (McCrimmon Dep. 23:17-24:5.)  For the purposes of the present motion,
however, the court must view the disputed evidence in the light most favorable to Kerns.  *See
Anderson*, 477 U.S. at 255.

changed the form to reflect one to two days.  (*Id.* at 412:6-24; Def. Ex. L, at KERNS0104.)

According to Kerns, when he submitted the second FMLA request form, McCrimmon to him,

"Everything looks like it is in order.  And, you know, you should have no problem."  (Kerns Dep.

420:11-14.)  Kerns asked if there was anything else he could do, and McCrimmon replied, "No,

you're fine."  (*Id.* at 422:22-423:23.)[26]  Kerns followed up with McCrimmon numerous times (*id.*

at 324:3-325:22), and Drexel never formally denied his request.

　　　Based on the evidence currently before the court, Drexel takes issue not with the

completion of the second certification or whether Kerns actually suffered from an FMLA-

qualified medical condition, but only the adequacy of Lozowski's certification's "equivocal

language . . . to establish a medical necessity for plaintiff's intermittent leave."  (Def. Reply Br.

Supp. Mot. Summ. J. 3.)  Such questions regarding the adequacy of an otherwise materially

complete form could have been addressed through recourse to the second opinion of an

independent physician.  *See* § 2613(c).[27]  Drexel did not resort to this mechanism, and the

medical evidence, including Kerns's anxiety disorder and depression that Lozowski documented

---

　　　[26] McCrimmon's and Kerns's testimonies again differ in material ways.  McCrimmon
testified that she told Kerns that Lozowski's second certification remained problematic because
"[s]tress is not something that is covered under FMLA."  (McCrimmon Dep. 30:9-18; 35:4-11.)
McCrimmon explained that Lozowski needed "to clarify what his leave was [and] when he
would be able to take his leave."  (*Id.* at 35:4-11.)  For the purposes of the present motion,
however, the court must view the disputed evidence in the light most favorable to Kerns.  *See*
*Anderson*, 477 U.S. at 255.

　　　[27] While the language of 29 U.S.C. § 2613(c)(1) is merely permissive, *see Novak v.*
*MetroHealth Med. Ctr.*, 503 F.3d 572, 579-580 (6th Cir. 2007), the employer's failure to seek an
adequate certification once the employer questions the certification's validity leaves it in a
precarious evidentiary position where, without evidence of an immediate reason to disbelieve the
employee's qualification and in the face of the employee's medical records suggesting
qualification, the employer may not be able disprove the employee's qualification for FMLA
benefits, *see Thorson v. Gemini, Inc.*, 205 F.3d 370, 380-381 (8th Cir. 2000).

in his answers to the questions presented on form WH-380, including question 5B, at minimum raises issues of material fact.  Those issues include whether Kerns was entitled to FMLA benefits based on his submissions, *see* § 2612(a)(1)(D); whether Lozowski answered question 5B appropriately, *see* § 2613(b); and whether Drexel's demand for additional information regarding Kerns's condition was valid, *see* 29 C.F.R. §§ 825.307(a) & 825.306(b).  At this point, Drexel has presented no undisputed factual evidence on which it can contest Kerns's entitlement to FMLA benefits.

In any case, summary judgment is inappropriate at this time, because, even assuming that Drexel had the right to ask Kerns for clarification of what it perceived to be an inadequate answer to question 5B of form WH-380, *see Sorrell v. Rinker Materials Corp.*, 395 F.3d 332, 337 (6th Cir. 2005); *Novak*, 503 F.3d at 579, genuine issues of material fact exist.  First, Kerns has raised an issue of material fact regarding whether McCrimmon notified Kerns that his first form was incomplete or inadequate for two reasons—(1) that the form did not specify details about when Kerns's condition might require him to be absent, and (2) that the form certified as necessary weeks of absences instead of days—or solely for the latter reason.  If McCrimmon did not notify Kerns regarding both deficiencies in the first form, then Drexel did not advise him of all defects and provide reasonable opportunity for cure, as required by 29 C.F.R. § 825.305(d).  Kerns has also raised an issue of material fact regarding whether McCrimmon notified him that his second form was incomplete or inadequate at all and whether she gave him an opportunity to cure, as required under the same regulations.  *See id.*  Thus, Drexel has not shown that there are no genuine issues of material fact for trial.

In the alternative, Drexel points to Kerns's absence on July 25, 2006 as an independent ground for his termination; thus, it alleges any interference with his FMLA leave on July 24, 2006 resulted in no harm.  The FMLA does not provide relief "unless the employee has been prejudiced by the violation:  The employer is liable only for compensation and benefits lost 'by reason of the violation,' . . . for other monetary losses sustained 'as a direct result of the violation,' and for 'appropriate' equitable relief, including employment, reinstatement, and promotion."  *Ragsdale*, 535 U.S. at 89.  While Drexel's legal contention is sound, Kerns has raised genuine issues of material fact regarding the significance of Kerns's July 25, 2006 absence in Drexel's decision to terminate Kerns, precluding the court from granting summary judgment to Drexel.  First, Kerns has raised a genuine issue of material fact as to whether he was terminated because of his absence on July 25, 2006.  The suspension-pending-termination letter referenced his absences on both July 24 and July 25, 2006 as the basis for his suspension (Def. Ex. L, at KERNS0655).  However, Michael Smith testified that "technically he was terminated because of his infraction on the 24th."  (M. Smith Dep. 39:16-40:2.)  Michael Smith continued that Kerns's absence on the July 25 "would have been irrelevant because when we decided the termination, he was terminated the 24th so if he filed for health and welfare on the 25th it wouldn't have counted because he would have been unemployed."  (*Id.* at 40:40-19.)   The final termination letter, dated August 11, 2006, justified termination based on violation of the LWOP policy, without specifying the operative LWOP dates.  (*Id.* at KERNS0656.)  Thus, Kerns has raised a genuine issue of material fact regarding the relevance of his July 25, 2006 absence.

Second, even if his termination was based on his July 25, 2006 absence, Kerns has raised a genuine issue of material fact regarding whether his absence on July 25, 2006 was excused or

excusable based on his receipt of Local 115 health and welfare benefits for that date.  Drexel was not aware of his application for those benefits at the time he was terminated, although Michael Smith testified that "[i]f he would have had an active health and welfare approved for that date, yes, that would have been covered by the health and welfare policy."  (*Id.* at 84:21-85:10.)  The absence would not have been counted against Kerns "because he would have been paid for by the union."  (*Id.* at 85:11-15.)  Kerns undisputedly received health and welfare benefits from Local 115 for July 25, 2006, and Kerns has raised a genuine issue regarding whether those benefits, awarded retroactively, meant he was not in violation of Drexel's LWOP policy for his absence on July 25, 2006.  Thus, a genuine issue remains regarding whether Drexel's independent justification that its violation of the FMLA, if any, is not actionable because it resulted in no harm.  The court will therefore deny Drexel's motion as to Count V for the multiple reasons stated above.

### 2.    Title VII and PHRA Racial Discrimination Claims

In Counts I and IV of the Amended Complaint, Kerns alleges racial discrimination in violation of Title VII and the PHRA, respectively.[28]  Drexel moves for summary judgment on Kerns's racial discrimination claims on the grounds that Kerns fails to make his prima facie case and that, even if he did establish a prima facie case, it had a legitimate, nondiscriminatory reason for terminating Kerns's employment.

---

[28] Kerns's retaliation claims, also encompassed in those counts, will be discussed in a later section.

Title VII and the PHRA prohibit an employer from discriminating against any individual

on the basis of race.  42 U.S.C. § 2000e-2(a)[29]; 43 Pa. Cons. Stat. § 955(a).[30]  To prevail on Title

VII and PHRA claims, a plaintiff must at a minimum present circumstantial evidence of

discrimination using the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*,

411 U.S. 792 (1973).[31]  In the Third Circuit, the *McDonnell Douglas* burden-shifting analysis

---

[29] The full text of 42 U.S.C. § 2000e-2(a) provides:
>    It shall be an unlawful employment practice for an employer—
>    (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race . . . ; or
>    (2) to limit, segregate, or classify his employees or applicants for employment in any way which would . . . adversely affect his status as an employee, because of such individual's race . . . .

[30] The PHRA provides, in relevant part:
>    It shall be an unlawful discriminatory practice, unless based upon a bona fide occupational qualification . . . :
>>         (a) For any employer because of the race . . . of any individual . . . to refuse to hire or employ or contract with, or to bar or to discharge from employment such individual . . ., or to otherwise discriminate against such individual . . . with respect to compensation, hire, tenure, terms, conditions or privileges of employment or contract, if the individual . . . is the best able and most competent to perform the services required.

43 Pa. Cons. Stat. § 955(a).
    Title VII and PHRA claims are analyzed using the same framework and evidentiary burdens. *See Jones v. Sch. Dist. of Phila.*, 198 F.3d 403, 410-11 (3d Cir. 1999) (discrimination claim); *see also Woodson v. Scott Paper Co.*, 109 F.3d 913, 922-23 (3d Cir. 1997) (retaliation claim).

[31] Kerns also asks the court to apply the mixed-motive standard announced in *Griffiths v. Cigna Corp.*, 988 F.2d 457, 469-70 & n.12 (3d Cir. 1993).  Because Kerns has provided sufficient evidence to survive the motion for summary judgment under the *McDonnell Douglas* burden-shifting analysis, the court will not consider the mixed-motive standard at this time. Kerns may, nevertheless, decide to proceed under either theory at trial.  *See Houser v. Carpenter Tech. Corp.*, 216 F. App'x 263, 265 (3d Cir. Feb. 15, 2007) (noting that "the 'mixed motive' standard is normally used in instructing juries").  However, he should be aware that under mixed-motive standard, the Third Circuit requires evidence that "directly reflect[s] a discriminatory or retaliatory animus on the part of a person involved in the decisionmaking process," *Armbruster v.*

applies to claims of reverse discrimination.  *See Iadimarco v. Runyon*, 190 F.3d 151, 158 (3d Cir. 1999).  Under this approach, a plaintiff must first provide evidence to support a prima facie case of discrimination.  *See St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 (1993); *Iadimarco*, 190 F.3d at 157.  If the plaintiff meets this initial burden, the burden then shifts to the employer to articulate some legitimate, nondiscriminatory reason for its adverse employment action.  *See Iadimarco*, 190 F.3d at 157.  If the employer successfully proffers evidence of a legitimate, nondiscriminatory reason for its adverse employment action, the burden shifts back to the plaintiff to show that the reason proffered by the employer is a pretext for discrimination.  *See id.* at 157-58.

A prima facie case of unlawful discrimination under Title VII is comprised of four elements:  (1) the plaintiff is a member of a protected class, (2) the plaintiff is qualified for the job, (3) the employer took an adverse action that affected the terms and conditions of the plaintiff's employment, and (4) the circumstances permit an inference of unlawful discrimination.  *See Jones*, 198 F.3d at 411.

Drexel does not contest Kerns's prima facie case with respect to elements one, two, and three;[32] instead, it contends only that Kerns has not raised a permissible inference of unlawful discrimination.  A plaintiff's burden to establish a prima facie case of reverse discrimination is not onerous.  *See Marzano v. Computer Sci. Corp.*, 91 F.3d 497, 508 (3d Cir. 1996).  The plaintiff need only "present sufficient evidence to allow a reasonable fact finder to conclude

_____

*Unisys Corp.*, 32 F.3d 768, 778-79 (3d Cir. 1994).

[32] For purposes of Kerns's claims of racial discrimination, Kerns alleges liability based only on his termination on August 3, 2007.  (*See* Pl. Mem. Opp'n Def. Mot. Summ. J. 14.)

28

(given the totality of the circumstances) that the defendant treated him less favorably than others because of his race." *Messina v. E.I. Dupont De Neumours & Co. Inc.*, 141 F. App'x 57, 59 (3d Cir. 2005) (citing *Iadimarco*, 190 F.3d at 163). As the Third Circuit has held, "'[t]he evidentiary burden at this stage is rather modest: it is to demonstrate to the court that plaintiff's factual scenario is compatible with discriminatory intent—i.e., that discrimination could be a reason for the employer's action.'" *Id.* (quoting *Marzano*, 91 F.3d at 508).

Plaintiff relies on two forms of evidence to support his prima facie case of racial discrimination. First, plaintiff points to Carlton's and Ross's expressions of racial animus. In July 2005, around a year before Kerns's termination, Carlton commented that "[t]he brothers are running the place down here now" and that "he's got some of his boys that need work or need a job." (Kerns Dep. 280:18-282:9.) To connect these statements of racial animus with Kerns's actual discipline, Kerns documents that his direct supervisor Pompili was instructed by Pompili's supervisors, including Carlton, to target Kerns for discipline. Pompili told Kerns, "Off the record, I was told to keep a close eye on you." (*Id.* at 616:12-18.) Pompili explained to Kerns that this instruction resulted in Pompili's write-ups and micromanagement of Kerns. (*Id.* at 616:21-617:12.) On a different occasion, Ross commented to Kerns that "white guys" should be used to the cold when refusing him gloves for shoveling snow. (*Id.* at 196:1-197:22.)

Drexel contends that Carlton's and Ross's statements were "stray remarks" unrelated to the decisionmaking process. (*See* Def. Reply 4 (citing, e.g., *Ezold v. Wolf, Block, Schoor & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1992)).) Stray remarks by nondecisionmakers that are temporally and substantively distant from the adverse employment action cannot form the basis of a discrimination suit. *Ezold*, 983 F.2d at 545, 547. The comments in this case, however, are

29

not so stray as to reject them outright at this time.  Kerns has offered a theory, supported with

deposition testimony, that Carlton, motivated by racial animus, targeted him for mistreatment

because he was white and directed Pompili to scrutinize his work more closely than that of other,

nonwhite employees, resulting in his termination.[33]

Second, Kerns directs the court to the comparative treatment of nonwhite employees who

were treated more favorably than he was.  A plaintiff may rely on comparative treatment of

similarly situated employees of a nonprotected class to satisfy his prima facie case.  *See*

*Anderson v. Haverford Coll.*, 868 F. Supp. 741, 745-46 (E.D. Pa. 1994).  "Where evidence of

allegedly disparate treatment meted out to 'similarly situated' employees outside of the protected

class is relied upon, those individuals must 'have engaged in the same conduct without such

differentiating or mitigating circumstances that would distinguish their conduct or their

employer's treatment of them for it.'"  *Davis v. City of Phila. Water Dep't*, 57 F. App'x 90, 92

(3d Cir. 2003) (citing *Anderson*, 868 F. Supp. at 745).

Kerns identifies Effrain Garcia, CP, and LB as similarly situated nonwhite employees

who were treated more favorably.  Kerns has submitted evidence from which a reasonable jury

could find that Garcia is a similarly situated employee who received more favorable treatment

than Kerns.  Garcia was given three suspensions for violating the LWOP policy within a nine

month period before his termination.  He testified that a period of eight or nine months elapsed

between the first, one-day suspension and the last, twenty-eight-day suspension.  (Garcia Dep.

11:22-12:23.)  By contrast, the February 8 suspension action against Kerns included the warning

---

[33]  Ross's comment appears to be a stray remark because Ross was not the decisionmaker
in Kerns's termination and Kerns has not shown how the comment impacted the decisionmaking
process.

that "any other infraction of this type within the next 9 months could result in your immediate termination." (Pl. Admis. ¶ 32, Attach. H.) Kerns was terminated for his next LWOP occurrence. Thus, Kerns arguably received less favorable treatment than Garcia.[34]

Drexel argues that Garcia was not similarly situated because Garcia was on better terms with his managers, relying on *Maul v. Division of State Police*, 39 F. App'x 769 (3d Cir. 2002). In *Maul*, however, the plaintiff was terminated for his disciplinary record in total, so the relative comparative denominator was the other employee's overall disciplinary record. *Id.* at 771, 773. In this case, Drexel has not argued that Kerns was terminated based on his entire disciplinary record, so reference to Garcia's better overall relationship with management is immaterial; the material denominator is the chain of events culminating in their respective terminations for violation of Drexel's LWOP policies. Thus, Kerns has presented evidence that he was treated differently than a similarly situated nonwhite employee and that race was a possible motivating factor in the differential treatment. Kerns has established a prima facie case of racial discrimination.

The differential treatment of CP and LB also lends credence to an inference of discrimination within the LWOP policy that the court draws from Garcia's testimony; although, CP and LB are less relevant to the Kerns's case because they did not receive termination-level discipline. CP and LB were treated more favorably than Kerns at earlier stages of the disciplinary process. CP and LB were not given counseling-level discipline until they had incurred nonconsecutive LWOP occurrences. Kerns was given counseling-level discipline for

---

[34] Drexel contests this issue, but the resolution of facts is for the jury, not the court, on a motion for summary judgment.

LWOP on the consecutive days of June 15 and 16, 2005.  Kerns, unlike CP and LB, did not

benefit from the policy that Local 115 and Drexel arranged to prevent a "double wammy" against

workers by counting consecutive days of absence as a single LWOP occurrence.  (M. Smith Dep.

72:14-73:13; Def. Facts ¶ 26.)  Based on this evidence, Kerns has raised an inference of

discrimination within the LWOP policy sufficient for the summary judgment stage of litigation.[35]

      After determining that Kerns has established a prima facie case of racial discrimination,

the court must decide whether Drexel has articulated a legitimate and nondiscriminatory reason

for the plaintiff's termination.  The burden on the defendant is one of production; a defendant

must introduce

> evidence which, taken as true, would permit the conclusion that there was a nondiscriminatory reason for the unfavorable employment decision.  The employer need not prove that the tendered reason actually motivated its behavior, as throughout this burden-shifting paradigm the ultimate burden of proving intentional discrimination always rests with the plaintiff.

*Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994) (internal citation omitted) (citing *St. Mary's*

*Honor Ctr.*, 509 U.S. at 507; *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

---

[35] To counter Kerns's prima facie evidence, Drexel proffers Kerns's testimony that suggests Kerns was treated less favorably than both African American employees and white employees:

Q:    So you though you were held to a higher standard than who?
A:    Than a lot of black employees.
Q:    Any white employees?
A:    Probably.  Probably a few possibly.

(Kerns Dep. 202:4-16.)  This testimony is not presently relevant.  First, plaintiff only bears the burden of producing evidence that discrimination could be a reason for the employer's action, and the court has no reason to weigh this testimony to the exclusion of facts noted in the body of the opinion.  Second, Kerns's testimony here does not unambiguously suggest that adverse employment decisions against him were not racially motivated, only that it was possible that he was also held to a higher standard than some other white employees.

"The explanation provided must be legally sufficient to justify a judgment for the defendant," *Burdine*, 450 U.S. at 255, although the burden is "relatively light," *Fuentes*, 32 F.3d at 763.

Drexel proffers Kerns's LWOP violations as legitimate and nondiscriminatory reasons for his termination.  Between June 13, 2005 and February 8, 2006, Drexel disciplined Kerns six times for LWOP infractions.  (Def. Facts ¶ 49.)  After receiving a suspension letter warning that termination was the next step in discipline (*see* Pl. Admis. ¶ 32, Attach. H), Kerns was absent from work on July 24 and 25, 2006.  Drexel then terminated Kerns employment.  (Def. Ex. L, at KERNS0655-656.)  Drexel offers each of these absences as an independent violation of its LWOP policy and thus as a legitimate, nondiscriminatory justification for its termination decision.

Kerns argues that because he was exercising his FMLA right on July 24, 2005, his termination for his absence on that date was not a legitimate reason.  Kerns misconstrues the legal significance of the term "legitimate" within the burden-shifting paradigm that allows the defendant "to rebut the presumption of discrimination," *Burdine*, 450 U.S. at 254.  Whether the decision to terminate Kerns was improper under the *FMLA*, Drexel's proffered justification rebuts the inference of *racial discrimination* in violation of Title VII.  In the similar case of *Hazen Paper Co. v. Biggins*, 507 U.S. 604, 612 (1993), the Supreme Court addressed *McDonnell Douglas*'s "legitimate, nondiscriminatory reason" language and concluded that although it "might be read to mean that an employer violates the ADEA whenever its reason for firing an employee is improper *in any respect* . . . , this reading is obviously incorrect."  The Court then noted that "it cannot be true that an employer who fires an older black worker because the worker is black thereby violates the ADEA.  The employee's race is an improper reason, but it is

improper under Title VII, not the ADEA." *Id.* Thus, in this case, in light of the proffered nondiscriminatory reason for Drexel's decision, plaintiff has lost the presumption of racial discrimination established by the prima facie case. *See Burdine*, 450 U.S. at 255.[36]

The burden thus shifts back to Kerns. "[T]o defeat summary judgment when the defendant answers the plaintiff's prima facie case with legitimate, non-discriminatory reasons for its action, the plaintiff must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons, or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. On a defendant's motion for summary judgment, however, the court may not pretermit the jury's ability to draw inferences where the plaintiff has raised a genuine issue of material fact questioning the defendant's proffered nondiscriminatory reasons. The Third Circuit in *Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1066-67 (3d Cir. 1996), held that "the elements of the prima facie case and disbelief of the defendant's proffered reasons are the threshold findings, beyond which the jury is permitted, but not required, to draw an inference leading it to conclude that there was intentional discrimination." Thus, "a plaintiff may survive summary judgment . . . if the plaintiff produced sufficient evidence to raise a genuine issue of fact as to whether the employer's proffered reasons were not its true reasons for the challenged employment action." *Id.* at 1067; *see also Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 151 (2000).

---

[36] As the Supreme Court noted in *Biggins*, the court does not suggest that Drexel could lawfully fire Kerns for exercising his FMLA rights. Such conduct is actionable under the FMLA, as this court has analyzed above, but not under Title VII. *Cf. Biggins*, 507 U.S. at 512.

A plaintiff, nonetheless, "cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent." *Fuentes*, 32 F.3d at 764. Instead, the burden is a "difficult" one, which—for each legitimate, nondiscriminatory reason proffered by the defendant—requires the plaintiff to "demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons for its action that a reasonable factfinder could rationally find them unworthy of credence, and hence infer that the employer did not act for the asserted non-discriminatory reasons." *Id.* at 765 (internal alterations, quotations, and citations omitted). At this stage of analysis, the evidentiary burden is weightier than at the initial, prima facie stage, requiring the plaintiff to produce evidence of specific discriminatory motive in the adverse employment action. *See Simpson v. Kay Jewelers*, 142 F.3d 639, 646 (3d Cir. 1998) (holding that at the pretext stage, "the factual inquiry into the alleged discriminatory motives of the employer has risen to a new level of specificity").

To prove that Drexel's proffered reasons—that Kerns was terminated for his absences on July 24 and 25, 2006—were pretextual, Kerns argues that (1) Drexel's decision was based solely on his absence on July 24, so that the court should disbelieve any justification based on his July 25 absence; and (2) Drexel's decision to terminate him for his July 24 absence constituted selective enforcement of its LWOP policy based on race and was thus more likely than not motivated by racial discrimination. As already discussed Kerns has raised a genuine issue of material fact as to whether Drexel relied on his absence on July 25, 2006 in terminating him. The inconsistencies between the suspension-pending-termination letter and Michael Smith's

testimony and the ambiguity in the termination notice raise a genuine issue of material fact as to whether the July 25, 2006 absence was used as a pretext.  (*See* Def. Ex. L, at KERNS0655-56; M. Smith Dep. 39:16-40:2; 40:13-19.)

In addition, the evidence in this case, taken all together, is sufficient to support Kerns's burden and raise a material issue for the finder of fact as to whether race was a motivating factor in his termination for his absence on July 24, 2006.  The comparison to Garcia, and context provided by CP and LB, *see Ezold*, 983 F.2d at 546 (recognizing that a discriminatory atmosphere may be relevant in proving pretext), are not enough, standing alone, to support an inference of discriminatory intent.[37]   Nonetheless, those comparisons, the inferences drawn from Carlton's impliedly racist comments and his statements implying that he would replace Kerns with his friends, and Pompili's statements connecting Carlton to Pompili's disciplinary actions against Kerns, if believed by a jury, arguably refute the legitimate, nondiscriminatory justification proffered by Drexel for his termination based on his July 24, 2006 LWOP infraction.[38]   The court will thus deny Drexel's motion for summary judgment on Kerns's racial discrimination claims under Counts I (Title VII) and IV (PHRA).

---

[37] Focusing only on Drexel's proffered reason for terminating Kerns's employment for his absence on July 24, 2006, Kerns argues that Drexel selectively enforced its LWOP policy and that "[s]elective enforcement of disciplinary policies can demonstrate pretext."  (Pl. Mem. Opp'n Def. Mot. Summ. J. 18 (citing *Anderson v. Anheuser-Busch, Inc.*, No. 00-7089, 2000 U.S. App. LEXIS 23763 (2d Cir. Sept. 19, 2000).)  Kerns's burden at the pretext stage, however, requires a higher showing than a single comparative employee from a nonprotected class. *Cf. Simpson*, 142 F.3d at 645 ("[T]he mere favorable treatment of one younger manager as compared to one older manager may not be sufficient to infer age discrimination.").

[38] The court notes that this is dangerously close to the minimum amount of evidence that a plaintiff must produce to survive summary judgment.  Nonetheless, because of the genuine issues of material fact, the court will not prematurely remove this claim from consideration and judgment by the ultimate trier of fact.

### 3.     FMLA Retaliation Claim

In Count VI of the Amended Complaint, Kerns alleges retaliation for exercising his right to request FMLA leave.   The FMLA and its corresponding regulations provide that "[a]n employer is prohibited from discriminating against employees or prospective employees who have used FMLA leave. . . . [E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions, such as . . . disciplinary actions."  29 C.F.R. § 825.220(c); *see also Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 146-47 (3d Cir. 2004).

The *McDonnell-Douglas* burden-shifting standard applies to FMLA retaliation cases.  *See id.*  Kerns's FMLA retaliation claim relates only to his termination; he has produced no evidence of any other retaliatory action related to his exercise of his FMLA rights.  Drexel concedes that Kerns can prove a prima facie case of retaliation under FMLA.[39]  (*See* Def. Mem. Supp. Mot. Summ. J. 18 n.9.)

Drexel, nonetheless, offers Kerns's violation of its LWOP policy on July 24 and 25, 2006 as a nonretaliatory justification.  As already discussed Kerns has raised a genuine issue of material fact as to whether Drexel relied on his absence on July 25, 2006 in terminating him.  He has also raised a genuine issue of material fact as to whether he was entitled to FMLA leave on July 24, 2006.  If, as Drexel has conceded for this claim,[40] Kerns took FMLA leave on July 24,

---

[39] Thus, for the purposes of this motion, Drexel concedes that Kerns can make out a prima facie case showing "that (1) he took an FMLA leave, (2) he suffered an adverse employment decision, and (3) the adverse decision was causally related to his leave."  *Conoshenti*, 364 F.3d at 146.

[40] The court notes the apparent inconsistency between this concession and its argument that Kerns was not entitled to FMLA leave in its motion for summary judgment on Kerns's interference claim.  *See supra* Part II.C.1.  Although Drexel made that concession "[f]or the purposes of the present motion only," ostensibly the entire motion for summary judgment, not

2006 and his taking of that leave was casually related to his termination, his absence on that day

cannot be a "legally sufficient," legitimate, nonretaliatory justification for terminating his

employment. *See Burdine*, 450 U.S. at 255. As Drexel has offered no other basis for its

decision, the court will deny its motion for summary judgment as to Count VI.

### 4. Title VII and PHRA Retaliation Claims

In Counts I and VI of the Amended Complaint, Kerns alleges retaliation under Title VII[41]

and the PHRA,[42] respectively. Drexel moves for summary judgment on these claims. The

*McDonnell-Douglas* burden-shifting standard also applies to Title VII and PHRA retaliation

cases. *See Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 187 (3d Cir. 2003); *Weston v.*

*Pennsylvania*, 251 F.3d 420, 432 (3d Cir. 2001).[43]

To establish a prima facie case of retaliation under Title VII and the PHRA, Kerns must

show that (1) he was engaged in protected activity; (2) Drexel took an adverse employment

---

just the motion as it relates to the FMLA retaliation claim, both parties have treated this concession as if it relates only to that claim and not the entire motion, so the court will consider it accordingly.

[41] Section 704(a) of Title VII forbids an employer from discriminating against an employee "because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation . . . under this subchapter." 42 U.S.C. § 2000e-3(a); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 126 S. Ct. 2405, 2408 (2006); *Woodson v. Scott Paper Co.*, 109 F.3d 913, 919 (3d Cir. 1997).

[42] The PHRA forbids an employer from discriminating against an employee "because such individual has opposed any practice forbidden by this act, or because such individual has made a charge, testified or assisted, in any manner, in any investigation, proceeding or hearing under this act." 43 Pa. Cons. Stat. § 955(d).

[43] As noted above, Title VII and PHRA claims are analyzed using the same evidentiary burdens. *See Woodson*, 109 F.3d at 922-23 (retaliation claim); *see also Jones*, 198 F.3d at 410-11 (discrimination claim).

action against him, including discharge, subsequent to or contemporaneously with the protected

activity; and (3) there is a causal link between the protected activity and the adverse activity.

*Woodson*, 109 F.3d at 920.  Drexel disputes both that Kerns was engaged in a protected activity

and that there was a causal connection between any of his protected activities and subsequent

disciplinary actions.[44]

Drexel first moves for summary judgment on Kerns's Title VII and PHRA retaliation

claims on the ground that Kerns did not engage in a protected activity of opposition to unlawful

racial discrimination.  "Whether the employee opposes, or participates in a proceeding against,

the employer's activity, the employee must hold an objectively reasonable belief, in good faith,

that the activity they oppose is unlawful under Title VII."  *Moore v. City of Phila.*, 461 F.3d 331,

341 (3d Cir. 2006) (citing *Clark County v. Breeden*, 532 U.S. 268, 271 (2001) (per curiam)

(rejecting retaliation claim where "[n]o reasonable person could have believed that" the

underlying incident complained about "violated Title VII's standard" for unlawful

discrimination); *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1085 (3d Cir. 1996)

(holding that a retaliation plaintiff must "act[ ] under a good faith, reasonable belief that a

violation existed")).  "Moreover, the employee's 'opposition' to unlawful discrimination must

not be equivocal."  *Id.* (citing *Barber v. CSX Distrib. Servs.*, 68 F.3d 694, 702 (3d Cir. 1995)).

Drexel's argument that Kerns's opposition was not subjectively or objectively based on

racially discriminatory conduct is not supported in fact.  Reporting racial discrimination to the

human resources department is clearly a protected activity.  *See Zelinski v. Pa. State Police*, 108

---

[44] Kerns maintains his retaliation claims under Title VII and the PHRA for both the intermediate disciplinary actions against him and for his subsequent termination.  (*See* Pl. Mem Opp'n Def. Mot. Summ J. 19-20.)

F. App'x 700, 705 (3d Cir. 2004).  On December 8, 2005, Kerns complained to Drexel's human resources department that he was being discriminated against, although he was unsure whether it was on the basis of race, disability, union activity, or another reason.  Kerns, however, emphasized that race was the primary factor. (Kerns Dep. 291:1-10, 474:6-476:7; *see also* Karp Dep. 15:5-21 ("[Kerns] said that one person in particular [Carlton], who was African American, discriminated against him because he was Caucasian.").)  When he filed his "Complaint of Discrimination" form with the human resources department, he clearly identified race, age, and disability as reasons for his perceived discrimination at the hands of Pompili.  (Def. Ex. C, at 153.)  Regarding the objective basis of his belief, he knew at that point that Pompili was instructed by Carlton, his superior, to watch plaintiff closely and that Carlton and Ross had made race-based comments.  His claim therefore was both objectively and subjectively based on opposition to discriminatory conduct.[45]

Drexel also moves for summary judgment on Kerns's retaliation claim under Title VII and the PHRA on the ground that Kerns cannot establish a prima facie causal connection between the alleged protected activity and his termination.  Kerns argues that the temporal proximity between his protected activities and Drexel's subsequent disciplinary actions is sufficient to establish a causal connection.  To establish the requisite causal connection and avoid summary judgment, a plaintiff must produce evidence that shows "either (1) an unusually suggestive temporal proximity between the protected activity and the allegedly retaliatory action, or (2) a pattern of antagonism coupled with timing to establish a causal link."  *Lauren W. v.*

---

[45] Drexel does not contest that Kerns's December 27, 2005 PCHR complaint and June 6, 2006 EEOC complaint were protected activities.

*DeFaminis*, 480 F.3d 259, 267 (3d Cir. 2007) (citing *Krouse v. Am. Sterilizer Co.*, 126 F.3d 494, 503-04 (3d Cir. 1997); *Woodson*, 109 F.3d at 920-21)).  To show an "unusually suggestive temporal proximity," "[t]he amount of time between the protected activity and the alleged retaliation is a circumstance to be considered by a fact-finder in determining if the plaintiff has established the required causation."  *Shellenberger*, 318 F.3d at 189.  After complaining to Karp about racial discrimination on December 8, 2005, Kerns was subjected to a series of disciplinary actions, starting on December 12, 2005 and ending with his termination for taking LWOP on August 3, 2006.[46]  (*See* Def. Facts ¶ 39).  The timing of his discipline on December 12, 2005, four days after his internal complaint to human resources, is highly suggestive of retaliation.[47]  Kerns has shown an unusually suggestive temporal proximity between his December 8 complaint and discipline on December 12; however, to maintain a claim stemming for discipline that developed during first half of 2006 and his eventual termination, he must establish that Drexel engaged in a pattern of antagonism.

The Third Circuit first recognized the pattern of antagonism option in *Robinson v. SEPTA*, 982 F.2d 892, 894 (3d Cir. 1993).  In *Robinson*, although almost two years passed

---

[46] In its summary judgment motion, Drexel has not argued that the December 12, 2005 discipline was not an adverse employment action.  This and similar disciplinary actions are sufficiently adverse because "a reasonable employee would have found the challenged action materially adverse, 'which in this context means it might have dissuaded a reasonable worker from making or supporting a charge of discrimination.'"  *See Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 68 (2006) (citations omitted).

[47] Karp testified that she spoke to Kerns's supervisors, including Pompili, during her investigation of his complaint.  (Karp Dep. 20:8-21.)  Although the timing of notification to Pompili, Kerns's immediate supervisor, and Pompili's own supervisors is somewhat uncertain, Kerns has raised a genuine issue of material fact preventing summary judgment at the prima facie stage of the retaliation case.

41

between the protected activity and the employee's discharge, the Third Circuit nonetheless held

that "the intervening pattern of antagonism that [the employer] demonstrated" allowed a

reasonable inference that "the initial series of events . . . caused [the employee's] and [the

employer's] relationship to deteriorate, and set a pattern of behavior that [the employer] followed

in retaliating against [the employee's] later efforts at opposing the Title VII violations he

perceived." *Id.* at 895. "Thus, a plaintiff can establish a link between his or her protected

behavior and subsequent discharge if the employer engaged in a pattern of antagonism in the

intervening period." *Woodson*, 109 F.3d at 921. In this case, the escalating pattern of discipline

tracked Kerns's continued pursuit of protected rights[48]—such as his December 27, 2005 PCHR

complaint;[49] June 6, 2006 EEOC charge; and meeting with Drexel's human resources department

to discuss FMLA and disability leave—and resulted in his termination.[50] Kerns has thus made

out a prima facie case of retaliation for Drexel's immediate disciplinary action against him on

December 12, 2005; subsequent disciplinary actions; and his eventual termination.

---

[48] Kerns was disciplined for LWOP violations on January 30, 2006 and February 8, 2006, and for reasons unrelated to LWOP infractions on February 2, March 6, March 8, May 12 and July 19, 2006. (Def. Facts ¶¶ 39, 49.)

[49] At some point, Carlton attended a PCHR fact-finding conference regarding Kerns's December 27, 2005 administrative charge (Carlton Dep. 93:23-95:5), evidencing his knowledge of the administrative complaint.

[50] Drexel argues that the temporal proximity does not exist in this case because Drexel also engaged in adverse employment actions before Kerns's December 8, 2005 complaint. Prior discipline does not disprove the retaliatory intent of Drexel's later disciplinary actions against Kerns; Drexel's motivation could have shifted from a proper disciplinary intent to a retaliatory intent after he engaged in those activities. Therefore, Drexel's argument that it did not retaliate because it made adverse decisions against Kerns both before and after Kerns's internal complaint is insufficient for the summary judgment stage.

42

The burden thus shifts to Drexel to produce legitimate and nonretaliatory justifications for its adverse actions.  Drexel has not proffered any nonretaliatory justification for its intermediate disciplinary action against Kerns, including the disciplinary action for unspecified poor work performance on December 12, 2005 and subsequent disciplinary actions on February 2, March 6, March 8, May 12 and July 19, 2006.  (Def. Facts ¶ 39.)  Thus, Drexel is not entitled to summary judgment on that portion of Kerns's retaliation claim under Title VII and the PHRA that arises out of these disciplinary actions.

Drexel, however, proffers a legitimate, nonretaliatory explanation for terminating Kerns's employment.  Drexel points to Kerns's violation of its LWOP policy on July 24 and 25, 2006 as a nonretaliatory justification.  Kerns chooses to rest his case for pretext in his retaliatory termination claim on the ground that he did not violate the LWOP policy.[51]  Rather, he was exercising his FMLA rights.  As noted above, even if Kerns were exercising his FMLA rights on July 24, 2005, his termination for his absence on that date for that reason does not rebut Drexel's proffered justification as a pretext for retaliation for purposes of a retaliation claim under Title VII and the PHRA.  If Drexel terminated his employment for exercising his FMLA rights, as Kerns contends, that conclusion rebuts the permissive inference of *retaliation* in violation of Title VII and the PHRA.  *Cf. Hazen Paper Co.*, 507 U.S. at 612.  Thus, Kerns has lost the presumption of retaliatory termination in violation of Title VII and the PHRA established by the

---

[51] As discussed earlier, the court concludes that Kerns's pretext argument for his racial discrimination claim succeeds to the extent that his evidence refutes Drexel's nondiscriminatory reason because a reasonable fact finder could conclude that race was more likely than not a motivating factor in his termination.  *See* Part II.B.2.  Kerns has not offered evidence or argument similarly permitting a reasonable fact finder to conclude that his termination was more likely than not motivated by retaliatory intent.

prima facie case and has not offered evidence that the proffered reason was a pretext for
retaliation or that there was some other evidence from which a reasonable jury could conclude
that retaliation was more likely than not a motivating factor in the termination.  Kerns has offered
no other argument or evidence that retaliation for engaging in protected opposition to racial
discrimination motivated his termination on July 24, 2006.  Thus, the court will grant Drexel
summary judgment on Kerns's retaliatory termination claims under Title VII (contained in Count
I) and the PHRA (contained in Count IV).  Kerns's claims will survive only to the extent that his
Title VII and PHRA retaliation claims under Counts I and IV, respectively, allege adverse action
unrelated to his termination.

**III.    Conclusion**

Kerns has sufficiently exhausted available administrative remedies to allow his claims of
retaliatory and discriminatory termination to proceed.  The court will therefore deny Drexel's
motion for summary judgment as to Counts I and IV of the Amended Complaint on the basis of
failure to exhaust administrative remedies.

Because Kerns has conceded that he has insufficient evidence to proceed on his ADEA
and ADA claims, the court will grant Drexel's motion for summary judgment as to Counts II and
III.  The court will also grant Drexel's motion for summary judgment with respect to Kerns's
retaliatory termination claims under Title VII (contained in Count I) and the PHRA (contained in
Count IV) because Kerns has offered no evidence showing that Drexel's nonretaliatory
justification for his termination was pretextual as to retaliatory termination.

The court will deny Drexel's motion for summary judgment with respect to Kerns's
FMLA claim (Count V), FMLA retaliation claim (Count VI), and discrimination claims under

44

Title VII (contained in Count I) and the PHRA (contained in Count IV).  Finally, the court will

deny Drexel's motion for summary judgment with respect to Kerns's retaliation claims under

Title VII (contained in Count I) and the PHRA (contained in Count IV) to the extent they are

based on adverse actions other than his termination.

45

# IN THE UNITED STATES DISTRICT COURT
# FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CHRISTOPHER KERNS, | : | |
| Plaintiff, | : | CIVIL ACTION |
| | : | |
| v. | : | NO. 06-5575 |
| | : | |
| DREXEL UNIVERSITY, | : | |
| Defendant. | : | |

## Order

**AND NOW** on this _____ day of July 2008, upon consideration of defendant Drexel University's motion for summary judgment (Doc. No. 34), plaintiff Christopher Kerns's response, and defendant's reply thereto, **IT IS HEREBY ORDERED** that:

1.  Defendant's motion is GRANTED as to Counts I and IV as they relate to retaliatory termination.  Judgment is ENTERED for Drexel University and against Christopher Kerns as to Counts I and IV for claims alleging retaliatory termination.  Defendant's motion is DENIED as to Counts I and IV for claims alleging retaliation unrelated to his termination.  Defendant's motion is DENIED as to Counts I and IV for claims alleging racial discrimination.

2.  Defendant's motion is GRANTED as to Counts II and III with plaintiff's agreement.  Judgment is ENTERED for Drexel University and against Christopher Kerns as to Counts II and III.

3.      Defendant's motion is DENIED as to Counts V and VI.

4.      Trial on the remaining claims is scheduled for December 15, 2008 at 10:00 AM.


    s/ William H. Yohn Jr.

William H. Yohn Jr., Judge